Filed 3/19/15  Kenyon v. Applied Technologies Associates CA2/6
Opinion following rehearing

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| MARK KENYON, | 2d Civil No. B249735 |
| | (Super. Ct. No. CV 128052) |
| Plaintiff and Respondent, | (San Luis Obispo County) |
| v. | OPINION ON REHEARING |
| APPLIED TECHNOLOGIES ASSOCIATES, | |
| Defendant and Appellant. | |

Applied Technologies Associates, Inc. (ATA)[1] hired Mark Kenyon in 1983, with no specific agreement about the length of his employment.  In 1986, Kenyon acknowledged receipt of the company's policy and procedure manual (the manual).  The manual stated that the employment relationship between ATA and an employee could be terminated at will by either party at any time.  In 1992, Kenyon received an updated manual and signed an acknowledgment stating, "I understand that employment with the company is not for a specified term and is at the mutual consent of the employee and the Company.  Accordingly, either the employee or the Company can terminate the employment relationship 'at will', with or without cause, at any time."

---

[1] Unless otherwise indicated, all references to ATA include its predecessors in interest and affiliates.

ATA's written termination policy was still in effect in 2011, when Kenyon's employment was terminated. Kenyon sued, claiming that ATA had breached both an implied-in-fact contract not to discharge without good cause and the implied covenant of good faith and fair dealing. Following the denial of ATA's motions for summary judgment and nonsuit, a jury found in Kenyon's favor and awarded him $500,671 in damages. ATA's motion for judgment notwithstanding the verdict (JNOV) was denied.

We previously reversed the judgment in an unpublished opinion after concluding as a matter of law that Kenyon was an at-will employee and thus subject to dismissal with or without cause. We subsequently granted rehearing and Kenyon's request for additional briefing. Upon further consideration, we conclude our original opinion was correct in both its result and its reasoning. Accordingly, we shall reverse the judgment and order that JNOV be entered in ATA's favor.

FACTUAL AND PROCEDURAL BACKGROUND

ATA and its affiliate, Scientific Drilling International (SDI), have offices in California and Texas. ATA's founder, Don Van Steenwyk, owned the company along with his wife, Elizabeth. Don Van Steenwyk hired Kenyon in 1983. Kenyon reported to and worked closely with Don Van Steenwyk for about 25 years.

In May 1986, ATA provided Kenyon a manual which included its termination policy. That policy opened with the following paragraph: "It should be remembered that employment at [ATA] is at the mutual consent of the employee and employer. Consequently, either the employee or the employer can terminate the employment relationship at will at any time." The termination policy also discussed voluntary and involuntary terminations, including terminations for cause. Kenyon signed a document acknowledging he received the manual and understood he was responsible for becoming familiar with its contents, which described the general personnel policies of ATA which governed his employment. The document also stated that "[s]ince information, policies, and benefits described are necessarily subject to change, I understand and agree that any such changes can be made by [ATA] in its

2

sole and absolute discretion, and that material changes will be made known to employees through the usual channels of communication within a reasonable period of time."

In 1992, Kenyon received an updated manual and signed another acknowledgment of receipt. After opening with language similar to the acknowledgment Kenyon signed in 1986, the new acknowledgment expressed his "understand[ing] that an employee or the employer the Company can terminate the employment relationship 'at will', with or without cause, at any time." The updated manual restated the termination policy in the same language as the 1986 manual, including the express at-will provision.

Don Van Steenwyk retired in mid-2009 and passed away later that year. Fred Watson became ATA's President, and Kenyon reported to him. Elizabeth Van Steenwyk and her family retained ownership of ATA, which continued to grant Kenyon salary increases, cash awards and bonuses. In 2010, ATA named Kenyon Vice-President of Operations of Stoneway Properties, a new division for vineyards and other non-oil field operations. He moved his office to Stoneway's winery.

Kenyon began reporting to Elizabeth Van Steenwyk after Watson's retirement in July 2011.[2] The following September, Sheri Gundrum was hired to do bookkeeping for Stoneway. Gundrum reported to Elizabeth Van Steenwyk but was supervised by Kenyon. Gundrum's job duties required that she communicate with ATA employees in multiple locations.

In early November, Gundrum complained about Kenyon's management style to another manager in Houston. The manager arranged for Rob McKee, ATA's sole senior vice-president in Paso Robles, to meet with Gundrum. Gundrum talked to McKee about Kenyon's management style. According to Gundrum, she did not complain of intimidation because she feared Kenyon would retaliate.

On November 9, Kenyon spoke to Gundrum about certain issues several times throughout the day. At trial, Gundrum characterized these interactions as

---

[2] Unless otherwise noted, all further date references are to the year 2011.

3

confrontations that were both stressful and intimidating.  She purportedly had an asthma attack that night and called in sick the next day.  When she returned to work the following day, she once again had issues with Kenyon's conduct.  Gundrum spoke with Jessica Kollhoff, the general manager of the winery.  Gundrum told Kollhoff that Kenyon hovered around her, blocked her path, followed her, and waited for her outside the women's restroom.  Kollhoff notified ATA's human resources personnel.

On November 14, a human resources representative from ATA met with Gundrum, while Kenyon was away.  Daniel Carter, Vice-President and General Counsel of ATA and SDI, met with Gundrum later that week.  Carter also gathered information from other employees, and concluded it was Gundrum's perception that a hostile work environment existed.  Carter recommended that management issue a written warning to Kenyon.  Elizabeth Van Steenwyk, McKee and the human resources manager agreed.

On November 17, Carter sent Kenyon a text message suggesting they meet.  They exchanged messages and met at a Starbucks coffee shop that same day.  Carter gave Kenyon an employee warning notice which includes the following description of his "Infraction":  "A hostile work environment claim was alleged against [Kenyon]. . . .  Based on conversations with the employee and further inquiry of [McKee, Cook and Kollhoff], it appears that a hostile work environment may indeed exist, if not in fact at least by perception."  The notice included a "Plan for Improvement" which requested that Kenyon "refrain from 'hovering' over [and] 'following' employees, and . . . invading the private space of employees."  It also stated that further complaints would be immediately investigated, and if the complaint were proven accurate, Kenyon would be disciplined, and "a written warning, suspension, or termination" might result.

Carter's meeting with Kenyon lasted about 10 minutes.  Before Kenyon left, he denied harassing anyone and said he would submit a written response.

That night, Elizabeth Van Steenwyk sent Kenyon an email.  Her email said she would not be in the office the next day, which was a Friday, and would speak with him the following Monday.  She also told him to obtain duplicate copies of his office and desk keys for her and give all blank company checks in his possession to Gundrum.

4

Kenyon called in sick the next day. Carter emailed Kenyon later that same day to inform him that "effective immediately," he was suspended with pay for two weeks, for a "cooling off" period, when Carter would "conclude all facets of [his] investigation." Carter instructed Kenyon that he must not communicate with winery or ranch employees or visit the winery or ranch during his suspension.

Carter continued gathering information and documentation from other ATA employees. On November 30, Carter submitted a report describing recent and old complaints about Kenyon's conduct. ATA had not demoted or suspended Kenyon, or issued him a written warning as a result of any incidents described in the report. Carter recommended that Kenyon "be terminated immediately" and "offered the opportunity to resign and provide [ATA] a full release," in exchange for 28 weeks of severance pay. He further recommended that Kenyon should "be discharged for cause" if he did not resign. After speaking with Elizabeth Van Steenwyk, management approved Carter's recommendations and instructed Kenyon to come to its office on December 1.

Kenyon met with McKee, Carter, and the human resources manager on December 1, and presented written requests for his payroll, personnel, and human resource records. He also offered Carter his written response to the harassment claim. Carter gave Kenyon a termination letter which stated that "[f]ollowing [his] investigation . . . a pattern of subordinate abuse emerged"; and that Kenyon was immediately released from "all future work responsibilities." The letter further advised Kenyon he could not visit ATA's winery or ranch locations, including his office, or have contact with winery or ranch employees. The letter enclosed a severance agreement and release that Kenyon apparently never signed.

Kenyon sued ATA for breach of contract, breach of the implied covenant of good faith and fair dealing, wrongful termination in violation of public policy, age discrimination, and intentional infliction of emotional distress. The trial court granted ATA's motion for summary judgment on the non-contract claims, but denied the motion as to the contract claims.

5

At trial, Kenyon testified about his employment history. He also testified that to his knowledge ATA terminated employees only for cause following a series of progressive discipline steps. There was not, however, any testimony or other evidence concerning representations or promises made to Kenyon after he signed either acknowledgment.

At the conclusion of Kenyon's case-in-chief, ATA moved for a nonsuit on the ground that, as a matter of law, Kenyon was an at-will employee. The court denied the motion. The jury then returned a special verdict finding that: (1) Kenyon was an employee of ATA; (2) Kenyon was not "an at-will employee of ATA such that his employment could be ended, at any time, for any reason, or for no reason at all"; (3) ATA promised, "by words or conduct, not to discharge . . . Kenyon except for good cause"; (4) Kenyon substantially performed his job duties; (5) ATA did not "have good cause to discharge" him, or act in good faith in doing so; (6) Kenyon was harmed by the discharge; and (7) his total economic loss was $500,671. The court denied ATA's subsequent motion for JNOV, and awarded Kenyon $4,752.51 in costs.

DISCUSSION

ATA contends the court erred in failing to enter JNOV in its favor because Kenyon failed as a matter of law to meet his burden of proving he had a contractual right to be terminated only upon a showing of good cause. We agree.

When reviewing rulings on a motion for JNOV, we determine "whether it appears from the record, viewed most favorably to the party securing the verdict, that any substantial evidence supports the verdict." (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.) Issues that present solely a question of law, however, are reviewed de novo. (*Ibid.*)

An employment having no specified term may be terminated at the will of either party. (Lab. Code, § 2922; *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 678 (*Foley*).) When employment is at-will, the employer's motive for terminating an employee is irrelevant unless it amounts to a violation of public policy. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 351 (*Guz*).)

6

Kenyon bore the burden of rebutting the statutory presumption that his employment with ATA was at-will. (*Haycock v. Hughes Aircraft Co.* (1994) 22 Cal.App.4th 1473, 1489.) Although the existence of an implied promise to discharge for cause is generally a question of fact for the jury, the issue may be resolved as a matter of law if the material facts are undisputed and permit but one conclusion. (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1386-1387.)

Here, it is undisputed that Kenyon signed two acknowledgements of his receipt of ATA's manual, the latter of which expressly and unequivocally states that his employment with the company was at-will. The latter acknowledgement goes even further by specifically documenting Kenyon's "understand[ing] that employment with the Company is not for a specified term and is at the mutual consent of the employee and the Company. Accordingly, either the employee or the Company can terminate the employment relationship 'at will,' with or without cause, at any time."

These acknowledgements constitute an express agreement for at-will employment. (*Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 629 (*Camp*), superseded by statute on another ground as stated in *Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 427.) Such an agreement "is controlling even if it is not contained in an integrated employment contract. [Citation.]" (*Ibid.*; *Wagner v. Glendale Adventist Medical Center* (1989) 216 Cal.App.3d 1379, 1393.) The agreement thus cannot be overcome by evidence of a prior or contemporaneous agreement to the contrary. (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 389 (*Dore*); see also *Guz, supra*, 24 Cal.4th 317, 340, fn. 10, and cases cited therein].)[3]

---

[3] Kenyon complains that the acknowledgments "bear no factual resemblance" to the contracts and acknowledgements at issue in *Dore* and *Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33. Neither *Dore* nor *Starzynski*, however, purports to set a benchmark for express at-will employment agreements. As the court in *Dore* recognized, a reference to "at-will" employment unambiguously conveys the understanding that the employee may be terminated with or without cause. (*Dore, supra*, 39 Cal.4th at p. 392.) Here, as in *Camp*, the defendant employer "submitted the [employee's] signed acknowledgement forms on which [he] agreed that [his] employment was at will." (*Camp, supra*, 35 Cal.App.4th at p. 629.) As the court found, "[t]he Camps' allegation of

7

In denying summary judgment, the court reasoned among other things that there was "some ambiguity in the [ATA] manual concerning cause for termination." There is nothing ambiguous, however, in the manual's reference to Kenyon's employment being "at-will" or in Kenyon's 1992 acknowledgment of the same. "For the parties to specify—indeed to emphasize—that [Kenyon's] employment was at will . . . would make no sense if their true meaning was that his employment could be terminated only for cause." (*Dore*, *supra*, 39 Cal.4th at p. 392.) Even absent Kenyon's acknowledgment, the termination policy itself opens with the at-will provision and goes on to reiterate, "either the employee or the employer can terminate the employment relationship at-will at any time." This clause and its prominent placement "establish[] beyond contrary inference that [ATA] intended employment to be at will." (*Guz*, *supra*, 24 Cal.4th at p. 341, fn. 11.)

Because an express agreement for at-will employment is present here, the factors offered to rebut the presumption of at-will employment— i.e., "'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which the employee is engaged'"[4]—simply do not apply. (*Halvorsen v.* (1998) 65 Cal.App.4th 1383, 1388.) The significant passage of time between Kenyon's execution of the agreement and his termination does not alter this conclusion. (*Ibid.*)

Kenyon asserts that the existence of an express agreement for at-will employment is not determinative because there was evidence from which the jury could have found the agreement was subsequently modified to prohibit termination of his

___

an *implied* contract requiring good cause for termination is obviously in conflict with their *express* statements on the acknowledgement forms." (*Ibid.*) We reach the same conclusion here.

[4] (*Pugh v. See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 327, disapproved on other grounds as stated in *Guz*, *supra*, 24 Cal.4th at p. 351; *Foley*, *supra*, 47 Cal.3d 654, 680 [adopting the factors stated in *Pugh*].)

8

employment without good cause.[5]  Although the court referred to modification in its order denying summary judgment, Kenyon never argued modification below.  In opposing summary judgment, he admitted signing the acknowledgements but responded that this fact was "irrelevant" because "[t]ermination was 'for cause'" and "'[a]t will'" was thus "not applicable."  At trial, he did not ask the jury to decide whether the agreement had been modified or request instructions on that issue.  Instead, he argued that no such agreement ever existed and that "literally . . . everything" was relevant to the jury's determination whether there was an implied-in-fact contract to discharge only for good cause.  Although the latter assertion may apply to a plaintiff seeking to rebut the presumption of at-will employment, it does not apply to an employee, like Kenyon, tasked with overcoming an express agreement to that effect.  (*Halvorsen v. Aramark Uniform Services, Inc.*, *supra*, 65 Cal.App.4th at p. 1388.)[6]

       In any event, Kenyon's proffered evidence failed as a matter of law to support a finding that ATA had consented to modifying the express agreement that Kenyon could be fired at-will to effectively provide for the exact opposite.  (See *Howard v. County of Amador* (1990) 220 Cal.App.3d 962, 977 [modification of a contract requires mutual consent].)  Kenyon correctly notes that both of the acknowledgements he signed provided the company with "sole and absolute discretion" to change its policies, but they also provide that any such changes would be made known to all employees

---

[5] Civil Code section 1698, subdivision (c) provides that "[u]nless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration."

[6] The jury was instructed pursuant to CACI No. 2403 that it could consider the *Pugh/Foley* factors in deciding whether the parties had an implied-in-fact agreement to terminate only for good cause.  The jury was also instructed:  "If you find that Mark Kenyon's employment at ATA was 'at-will,' it cannot be overcome by an implied contrary understanding."  This sentence was presumably added pursuant to the direction that "[i]n certain cases, it may be necessary to instruct the jury that *if it finds there is an at-will provision in an express written agreement*, there may not be an implied agreement to the contrary."  (Judicial Council of Cal., Civ. Jury Instns. (2014) Directions for Use for CACI No. 2403, p. 1280, italics added.)  The instruction as given plainly failed to adequately convey this concept.

"within a reasonable period of time." Moreover, the express at-will provision in the second acknowledgment is stated separate and apart from the provision referring to the company's discretion to prospectively change its policies. The manual, which Kenyon has conceded "is part of the [employment] contract," makes clear that "[a]ny new or revised policies will be distributed throughout the year along with a new Table of Contents." Kenyon offers no evidence, however, that ATA's termination policy was subsequently revised such that ATA could be found to have consciously given up its contractual right to discharge him without good cause.

The only "revised" policy Kenyon deems significant—the "Work Place Harassment Prevention Policy" (the harassment prevention policy)—cannot reasonably be construed as modifying either ATA's longstanding policy of at-will employment or the parties' express at-will agreement. Most notably, the record belies his assertion that the harassment prevention policy went into effect after he signed the 1992 acknowledgment. Although he offered a 2001 version of the policy that replaced a prior version that became effective in 1993, the policy itself originally went into effect on October 30, 1988. Kenyon offers nothing to demonstrate that the language he relies on was not part of the original policy. The harassment prevention policy thus cannot be construed as evidence of an agreement contrary to the parties' express agreement for at-will employment. (*Dore*, *supra*, 39 Cal.4th at p. 389.) In any event, that policy—designated as Policy Number 2.11—is immediately followed by Policy Number 2.12, the termination policy, which begins by reminding employees that "either the employee or the employer can terminate the employment relationship at will at any time." Moreover, ATA has a legal duty to protect its employees from certain types of harassment. Its harassment prevention policy was plainly created for that purpose.

According to Kenyon, the jury could reasonably find that the harassment prevention policy effected a modification of his express agreement for at-will employment because it states that "[t]he Company's [harassment] complaint procedure provides for an immediate, thorough, and objective investigation of any claim of unlawful or prohibited harassment." As we have noted, Kenyon offers no evidence that

10

this language was not part of the original policy that was in effect when he signed the 1992 acknowledgment. In any event, adopting Kenyon's logic would effectively compel the conclusion that ATA consciously conferred upon him a contractual right to be terminated only for good cause—in direct contravention of their express agreement to the contrary— simply by virtue of the fact he was accused of harassment. Nothing in the language, import, or purpose of the policy would support such a conclusion. ATA's notice to Kenyon regarding the harassment claims leveled against him similarly fails to support a finding that ATA had consciously relinquished its right to terminate him absent a showing that the claims of harassment were true.

Kenyon's other proffered evidence is equally unavailing. Even if the *Pugh/Foley* factors are relevant to the extent they concern conduct that occurred *subsequent* to the formation of the express at-will agreement, those factors do not support a finding that the parties modified that agreement to require cause for termination. As our Supreme Court has recognized, "We did not suggest [in *Foley*] that every vague combination of *Foley* factors, shaken together in a bag, necessarily allows a finding that the employee had a right to be discharged only for good cause, as determined in court." (*Guz*, *supra*, 24 Cal.4th at p. 337.)

None of the factors cited in *Pugh* and *Foley*, either individually or collectively, give rise to an implied-in-fact contract to terminate only for good cause, much less a modification of the parties' express agreement to the contrary. Kenyon's testimony that he was not aware of ATA ever firing anyone without cause is not particularly meaningful because the same was true when he expressly acknowledged that his employment was at-will. (*Dore*, *supra*, 39 Cal.4th at p. 384 [express agreement for at-will employment cannot be overcome by evidence of a prior or contemporaneous agreement to the contrary].) Moreover, the evidence merely reflects good employer practice, rather than ATA's intent to limit its power to terminate at-will. "Otherwise, an employer would be forced purposely to terminate employees for any and every infraction-or none at all-in order to maintain the presumption of at-will employment. The law does not require such caprice to avoid creating an implied in fact contract." (*Davis v.*

11

*Consolidated Freightways* (1994) 29 Cal.App.4th 354, 367.)  In any given termination, ATA might also be called upon to demonstrate that its decision was not undertaken "'for an unlawful reason or a purpose that contravenes fundamental public policy.'"  (*Ibid.*, quoting *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1094.)  As the manual makes clear, ATA may terminate either *for* cause, or *without* cause.  Its choice to pursue either course does not constitute a conscious waiver of its lawful right to pursue the other.

The only other potentially relevant factor is that ATA employed Kenyon for a lengthy period of time and gave him numerous raises and promotions along the way. The Supreme Court has made clear, however, that "an employee's mere passage of time in the employer's service, even where marked with tangible indicia that the employer approves of the employee's work, cannot *alone* form an implied-in-fact contract that the employee is no longer at will."  (*Guz*, *supra*, 24 Cal.4th at p. 341-342.)  Even when such evidence is considered in conjunction with other evidence, the issue is ultimately "whether the employer's words or conduct, on which an employee reasonably relied, gave rise to that *specific* understanding."  (*Id.* at p. 342.)  Nothing about Kenyon's employment history gave rise to a reasonable belief that ATA had knowingly modified its express contractual right to terminate him either with our without cause.

*Petition for Rehearing*

After our original opinion was filed in this case, Kenyon filed a 32-page petition for rehearing.  Although we do not deem it necessary to address each and every contention he raises, a few warrant discussion.

Kenyon alleges in his petition that we committed "the sin of omission" because we did not "address" *Cotran v. Rolling Hudig Hall International, Inc.* (1998) 17 Cal.4th 93 (*Cotran*) and because we "failed to properly apply the law to the facts" as dictated in *Guz, supra*, 24 Cal.4th 317.  *Cotran* is irrelevant to our analysis.  The issues in that case relate solely to the determination whether good cause existed to dismiss "an employee hired under an *implied* agreement not to be dismissed except for 'good cause[.]'"  (*Id.* at p. 95.)  As we have explained, ATA's motive for firing Kenyon never

12

became relevant here because he failed to establish a contractual right to continued employment.

We disagree with Kenyon's assertion that our original opinion failed "to properly apply the law to the facts" as provided in *Guz*.  Moreover, a comparison and contrast of the actual facts of that case to those here only provides further support for our conclusion.  In *Guz*, there was no express agreement for at-will employment.  It was thus proper to consider all the employer's personnel documents in determining whether there was an implied-in-fact agreement to terminate only for good cause.  (*Guz*, *supra*, 24 Cal.4th at pp. 339-330.)  In recognizing this our Supreme Court distinguished the case from those cases, such as this one, in which there is an express written agreement for at-will employment.  (*Id.* at p. 340, fn. 10.)

The court in *Guz* also recognized that even in the absence of an express agreement, "the more clear, prominent, complete, consistent, and all-encompassing the disclaimer language set forth in handbooks, policy manuals, and memoranda disseminated to employees, the greater the likelihood that workers could not form any reasonable contrary understanding."  (*Guz*, *supra*, 24 Cal.4th at p. 340, fn. 11.)  Although the court found no such clarity in the disclaimer at issue in *Guz*, the court "d[id] not foreclose the possibility an employer could promulgate a disclaimer clause which established beyond contrary inference that the employer intended employment to be at will."  (*Ibid.*)

The disclaimer at issue in *Guz* merely provided that employees had no contracts "'guaranteeing . . . continuous service'" and were subject to termination at the "'option'" of the employer (Bechtel).  (*Guz*, *supra*, 24 Cal.4th at p. 346.)  In holding there was a triable issue of material fact as to whether Guz had overcome the statutory presumption that his employment with Bechtel was at-will, the court reasoned that the language of Bechtel's disclaimer "did not foreclose an understanding between Bechtel and all its workers that Bechtel would make its termination decisions within the limits of his written personnel rules.  Given these ambiguities, a fact finder could rationally

13

determine that despite its general disclaimer, Bechtel had bound itself to the specific provisions of these documents."  (*Ibid.*)

As we have explained, ATA's other policies are not relevant because they were all in place when Kenyon expressly acknowledged that his employment was at-will. Moreover, ATA's termination policy does not merely state that it had the "option" to terminate its employees; rather, it expressly states that employment can be terminated "at will at any time."  Kenyon's 1992 acknowledgment is even stronger, making clear his understanding that "either the employee or the Company can terminate the employment relationship 'at will,' with or without cause, at any time."  *Guz* is thus plainly inapposite.

Kenyon's third argument is premised upon his mistaken belief that ATA cannot be found to have terminated him "at will" because it purported to terminate him for cause.  ATA's termination of Kenyon for cause did not constitute a waiver of its right to discharge him at will.  "Since an employer does not require good cause to terminate an at-will employee, in the normal course of events an employer need not either articulate or substantiate its reasons, except to provide an advance refutation for any inference that the true reason was illegal."  (*McGrory v. Applied Signal Technology, Inc*. (2013) 212 Cal.App.4th 1510, 1533.)  Moreover, as *Guz* makes clear, unless an employer has acted in violation of public policy, its motive and lack of care in terminating an employee are irrelevant when there is an express agreement for at-will employment.  (*Guz*, *supra,* 24 Cal.4th at p. 351.)  Kenyon also complains that our decision omitted expert opinion testimony concerning ATA's purported failure to follow its harassment prevention policy in terminating his employment.  That testimony is not relevant, however, because the parties had an express at-will agreement.  (*Ibid.*)

In petitioning for rehearing, Kenyon also asserts for the first time that both acknowledgments are not legally binding upon him because they were signed when ATA was known as Applied Navigation Devices (AND).  He asserts that "[d]uring the entire trial of this case there was not one scintilla of evidence proffered that ATA adopted the Notices and Acknowledgments of Receipt [he] signed with [AND]."  ATA did not offer any such evidence because Kenyon effectively conceded there was no legal distinction

14

between the two companies. In his separate statement opposing ATA's motion for summary judgment, Kenyon admitted he was employed by ATA "from November 8, 1983, through December 1, 2011." He made the same admission in his declaration and took no different position at trial. Although his respondent's brief notes that the name change took place after the acknowledgments were signed, he never goes on to assert that the acknowledgments were thus invalid. To the contrary, he expressly urges us to consider as fact that he was "hired by [ATA] on November 8, 1983." In light of this, he cannot now be heard to claim that the acknowledgments do not apply to his employment with ATA.

### *Additional Briefing*

At Kenyon's request, we allowed the parties to submit additional briefing to address the application of *McClain v. Great American Ins. Companies* (1989) 208 Cal.App.3d 1476, and *Wallis v. Farmers Group, Inc.* (1990) 220 Cal.App.3d 718. *McClain* and *Wallis* are both inapposite because they involved applications for employment. As our colleagues in the Third District recognized in rejecting the reasoning of both cases, "an application for employment is not a contract; it is a mere solicitation of an offer of employment. [Citation & fn. omitted.] As such the application cannot constitute an agreement, let alone a partially integrated agreement. [Citation.]" (*Harden v. Maybelline Sales Corp.* (1991) 230 Cal.App.3d 1550, 1555.) Kenyon also fails to inform us that our Supreme Court has disapproved of *Wallis* to the extent it held that an employment agreement's reference to termination "at any time" is sufficient to render a reference to "at-will" employment ambiguous, such that extrinsic evidence is admissible to determine whether the parties had an implied-in-fact agreement to terminate only for good cause. (*Dore*, *supra*, 39 Cal.4th at pp. 390-391, 394, fn. 2.)

We also allowed the parties to provide further briefing on the relevance of ATA's harassment prevention policy to the appeal. Nothing the briefs offer on this subject undermines our conclusion that ATA was entitled to JNOV on the ground that Kenyon was an at-will employee as a matter of law.

15

CONCLUSION AND DISPOSITION

Kenyon signed an acknowledgment in which he expressly agreed that his employment with ATA was at will and that he could be discharged at any time either with or without cause. Evidence of a prior or contemporaneous agreement to the contrary was thus inadmissible. Although the parties' agreement was subject to modification, Kenyon did not call upon the jury to make such a finding. Moreover, the evidence failed as a matter of law to support a finding that ATA had modified the agreement such that Kenyon had an implied-in-fact contractual right to be discharged only upon a showing of good cause. Because Kenyon's claims were premised upon such a finding, ATA was entitled to JNOV as a matter of law. In light of this conclusion, we need not decide whether the court should have granted summary judgment or nonsuit on the same ground. As Kenyon concedes, reversal of his breach of contract claim also compels reversal of his claim for breach of the covenant of good faith and fair dealing.

The order denying ATA's JNOV motion is reversed, and the superior court is directed to enter a new and different order granting the motion. ATA shall recover its costs on appeal.

NOT TO BE PUBLISHED.



PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.


16

Jac A. Crawford, Judge

Superior Court County of San Luis Obispo

_____

Kinman & Curry, Barry Alan Kinman and Marilyn P. Curry, for Plaintiff and Respondent.

Gordon & Rees, Don Willenburg; Gordon & Rees, Mollie Burks-Thomas and Marc A. Holmquist, for Defendant and Appellant.